# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **EMBRY JAY LOFTIS,** | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. CIV 09-379-FHS-SPS |
| **STACY SAMPSON, et al.,** | ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

This action is before the court on the defendants' second motion to dismiss or for summary judgment and the court's own motion to consider dismissal of the case as frivolous under 28 U.S.C. § 1915. The court has before it for consideration plaintiff's complaint, the defendants' motion, plaintiff's response, the parties' replies, and a special report prepared at the direction of the court, in accordance with *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978).

Plaintiff, an inmate in the custody of the Oklahoma Department of Corrections who is incarcerated at Lawton Correctional Facility in Lawton, Oklahoma, brings this action under the authority of 42 U.S.C. § 1983, seeking monetary and injunctive relief for alleged constitutional violations during his incarceration at the Carter County Detention Center (CCDC) in Ardmore, Oklahoma. The defendants are Stacy Sampson, CCDC Kitchen Supervisor; Chris Douthit, CCDC Jail Administrator; Jennifer Jolly, CCDC Assistant Administrator; Milton Anthony, Carter County Undersheriff; and Ken Grace, Sheriff of Carter County.

Plaintiff alleges that while he was a pretrial detainee in the CCDC, the defendants violated his constitutional rights by retaliating against him for using the administrative grievance process (Count 1) and by subjecting him to unconstitutional conditions of

confinement (Count 3).[1]  The record shows that plaintiff was booked into the CCDC on August 5, 2009, on a bench warrant for failure to appear on felony charges of unlawful possession of a controlled dangerous substance.  After his August 12, 2009, arraignment, he was remanded to the custody of the CCDC, pending his October 19, 2009, trial.

The defendants have moved the court for dismissal of this action or in the alternative for summary judgment.  Having moved for summary judgment in their favor, the movants are required to show the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Summary judgment is not appropriate if there exists a genuine material factual issue such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986).  In this regard, all evidence of the nonmoving party is deemed true, and all reasonable inferences are drawn in favor of the nonmoving party.  *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 114, 158-59 (1970)).  This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id*. at 249.  With these standards in mind, the court turns to the merits of the defendants' motion.

Count 1:  Retaliation

In Count 1 of the complaint, plaintiff alleges that on September 13, 2009, he submitted

---

[1] Count 2 of the complaint, which concerned plaintiff's access to the courts, was dismissed on February 14, 2011.  (Docket #85).

2

a Request to Staff to Defendant Stacy Sampson, the kitchen supervisor, raising his concerns about the food being served at the facility. On September 14, 2009, plaintiff was called to meet with Sampson and Defendant Chris Douthit, the facility administrator. Plaintiff claims Sampson became very upset at the meeting and threatened to serve only beans to the inmates from that day forward. That evening Sampson served beans with cornbread and sliced peaches, after the inmates already had been fed beans twice that week. When Sampson attempted to serve beans for lunch the next day, the inmates in D-Block overturned the food cart, causing an immediate lockdown of Cellblocks D and F. After an outbreak of violence between inmates and a guard, plaintiff and other inmates on F-Block were placed on a one-month lockdown and were allowed only one hour for showers every 72 hours. Plaintiff apparently is claiming these restrictions were in retaliation for his efforts to exhaust his administrative remedies regarding food at the facility.

"[P]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights. . . . [However], [a]n inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir. 2006) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)) (quotations omitted, emphasis in original), *cert. denied*, 549 U.S. 1059 (2006). An inmate claiming unconstitutional retaliation also "must prove that 'but for' the retaliatory motive, the incidents to which he refers . . . would not have taken place." *Peterson*, 429 F.3d at 1144 (quoting *Smith v. Maschner*, 899 F.2d 940, 949-50 (10th Cir. 1990)).

Defendants Sampson and Douthit state by affidavit that they met with plaintiff on September 14, 2009, to discuss plaintiff's concerns about food portions and temperature. Defendant Sampson denies becoming irate during the meeting and threatening to serve only beans to the inmates. Instead, Sampson asserts she told plaintiff that the previous kitchen supervisor had served beans every day, and she asked plaintiff if he was glad the menu had improved.

3

Defendant Sampson further asserts she did not retaliate against plaintiff by serving beans that evening and for lunch the next day. Instead, beans were on the weekly menu before the meeting with plaintiff. The inmates had not already been served beans twice that week, and they were not served beans again for at least a week after the incident.

According to the affidavits, Defendant Sampson did not "spread the word" among the inmates that she would be serving beans for all the meals. Rather, plaintiff circulated the rumor and incited the other inmates. When beans were served for lunch on September 15, 2009, one of the D-Block inmates, knocked his lunch tray to the floor. In the altercation that followed with the guards, the food cart was knocked over. (Docket #55, Exhibits 5-6, Incident Reports dated September 15, 2009). Plaintiff was not directly involved in the incident, but Defendants Sampson and Douthit believe he indirectly caused it by agitating other inmates with the false rumor about the menu. Because the F-Block inmates made threats to the jailers in response to the rumor they would be fed only beans, F-Block was placed on lockdown on September 15, 2009, for a little more than one week. The lockdown was not ordered to retaliate against plaintiff, but rather for legitimate safety concerns regarding threats to the jailers.

After careful review the court finds there are no issues of material fact with respect to Count 1 of the complaint. Plaintiff has failed to show that Defendants Sampson and Douthit retaliated against him in response to his use of the administrative grievance process. The lockdown was the result of threats to the facility officials by inmates in response to the bean rumor, and the lockdown was in response to legitimate safety concerns against the staff. Even taking plaintiff's allegations of Defendant Sampson's "bean threat" as true, he has failed to demonstrate that "but for" a retaliatory motive on the part of Defendants Sampson and Douthit, the incidents of which he complains would not have occurred. Furthermore, there is no basis for plaintiff's assertion that Douthit should have "cautioned" Sampson about her statements concerning the menu. Plaintiff has not stated a claim against Defendants Sampson and Douthit with respect to allegations in Count 1.

Plaintiff also alleges in Count 1 that Defendants Grace, Anthony, and Jolly should have "cautioned" Defendant Sampson about her alleged threat to begin serving only beans to the CCDC inmates. Defendants Grace, Anthony, and Jolly were not present at plaintiff's meeting with Ms. Sampson. "Personal participation is an essential allegation in a § 1983 claim." *Bennett v. Passic*, 545 F.2d 1260, 1262-63 (10th Cir. 1976) (citations omitted). *See also Mee v. Ortega*, 967 F.2d 423, 430 (10th Cir. 1992). Further, "[s]ection 1983 will not support a claim based on a respondeat superior theory of liability." *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). Therefore, Defendants Grace, Anthony, and Jolly also are not liable for the allegations in Count 1.

Count 3: Conditions of Confinement

Plaintiff claims in Count 3 that the CCDC was overcrowded and a fire hazard, and the conditions of confinement violated the agreement in *Battle v. Anderson*, No. 72-095-JHP. The overcrowding allegedly caused a food shortage, with inmates receiving cold, reduced food portions. In addition, CCDC inmates allegedly were deprived of the required one hour of fresh air and sunlight every 24 hours.

The defendants allege plaintiff did not exhaust his administrative remedies for his claims concerning fresh air and sunlight, so those claims should be dismissed. "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Inmates are required to exhaust available administrative remedies, and suits filed before the exhaustion requirement is met must be dismissed. *Booth v. Churner*, 532 U.S. 731, 740-41 (2001); *Yousef v. Reno*, 254 F.3d 1214, 1216 n.1 (10th Cir. 2001). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). In deciding a motion to dismiss based on nonexhaustion, the court can consider the administrative materials submitted by the parties.

5

*See Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1212 (10th Cir. 2003), *abrogated in part on other grounds*, *Jones v. Bock*, 549 U.S. 199 (2007).

According to the special report, the CCDC Inmate Grievance Policy requires an inmate to submit a written grievance if he "believes he or she has been subject to abuse, harassment, abridgement of civil rights or denied privileges specified in the posted rules." (Docket #55-11). Defendant Douthit states in his affidavit that prior to filing his complaint, plaintiff did not submit any written grievances regarding the claim that he was denied fresh air and sunlight. Because plaintiff has failed to challenge the alleged nonexhaustion, his claims concerning fresh air and sunshine are dismissed without prejudice for failure to exhaust administrative remedies.

Plaintiff's exhausted claims concerning the conditions of his jail confinement are analyzed under the instructions of *Craig v. Eberly*, 164 F.3d 490 (10th Cir. 1998):

> . . . Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, *see Bell v. Wolfish*, 111 U.S. 520, 535 (1979), the Eighth Amendment standard provides the benchmark for such claims. *See McClendon v. City of Albuquerque*, 79 F.3d 1014, 1022 (10th Cir. 1996). The Eighth Amendment requires jail officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher*, 143 F.3d 1299. 1310 (10th Cir. 1998). To hold a jailer personally liable for violating an inmate's right to humane conditions of confinement, a plaintiff must satisfy two requirements, consisting of an objective and subjective component. *See id.*
>
> The objective component requires that the alleged deprivation be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Although what constitutes cruel and unusual punishment under the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Trop v. Dulles*, 356 U.S. 56, 101 (1958) (plurality opinion)), the Constitution "does not mandate comfortable prisons," *id.* at 349. To the contrary, jail conditions may be "'restrictive and even harsh'" without violating constitutional rights. *Barney*, 143 F.3d at 1311 (quoting *Rhodes*, 452 U.S. at 347). Indeed, "only those deprivations denying the minimal civilized measure of life's necessities . . . are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (internal quotation marks and citation omitted); *accord Farmer v. Brennan*, 511 U.S. 825, 834

(1994). This inquiry turns not only on the severity of the alleged deprivations, but also on their duration. *See Barney*, 143 F.3d at 1311 ("An important factor in determining whether the conditions of confinement meet constitutional standards is the length of the incarceration."). Additionally, when, as in this case, a claim involves numerous alleged inhumane conditions, we must bear in mind that "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. However, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. at 305.

The subjective component requires the jail official to have a "sufficiently culpable state of mind." *Id.* At 297. In the context of prison-conditions claims, the required state of mind is one of "'deliberate indifference' to inmate health and safety." *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 302-03). In other words, the jailer is liable only if he or she "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* At 837. "It is not enough to establish that the official should have known of the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998).

*Craig*, 164 F.3d at 495.

According to Defendant Douthit's affidavit, plaintiff was housed in F-Block at the CCDC at all times relevant to the complaint. Each of the seven cells in F-Block measures 105 square feet and is designed to hold three to four inmates. During the time relevant to the complaint, F-Block housed an average of 23 inmates. Plaintiff initially was placed in a cell with three other inmates for 38 days, but then shared his cell with two inmates. The CCDC exceeded its maximum occupancy level on 14 occasions during the time relevant to this lawsuit. Those instances of excess inmate population were caused by a temporary influx of inmates, and the average daily inmate population during that time was under the maximum occupancy level. On October 14, 2009, shortly after plaintiff filed his complaint, the Oklahoma State Department of Health conducted an investigation of overcrowding and found the facility was not overcrowded. (Docket #55-12 at 1). The CCDC has a written policy regarding emergency evacuation of the jail in the event of a fire. (Docket #55-1 at 1-3). A March 24, 2010, inspection by the Oklahoma State Fire Marshal found some minor

deficiencies, but no fire hazards caused by overcrowding were noted. (Docket #55-13). In addition, the May 7, 2009, inspection of the fire sprinkler system found it to be in good, functioning order. (Docket #55-14 at 1-2).

Defendant Stacy Sampson's affidavit further states that the CCDC menus are planned a week in advance, based on a menu plan approved by a certified dietician/nutritionist. Some variations or deviations from the menu plan can be caused by the availability of certain food items or other factors. Inmates are served three meals a day, usually with three to five food items per meal. Food warming carts are used for hot meals. The Oklahoma State Department of Health conducts at least two surprise inspections each year, and no food-related violations of the Oklahoma Jail Standards were discovered during the time at issue in this action. Furthermore, the October 14, 2009, inspection found no substantiation of a complaint of cold food. (Docket #55-12 at 2). The jail had working food warmers, and none of the questioned inmates complained of cold food. (Docket #55-12 at 2).

After careful review of the record, the court again finds there are no genuine issues of material fact. The conditions of which plaintiff complains were unsubstantiated, and any deprivations did not rise to the level of unconstitutionality. Plaintiff's exhausted claims in Count 3 are meritless.

Injunctive Relief

Finally, plaintiff asks for injunctive relief to prevent further reprisals for his attempts to exhaust his administrative remedies and to prevent future denial of access to the courts. He also asks the court to order the CCDC to reduce overcrowding in accordance with the *Battle* decree.

First, the court notes that the *Battle* case, No. CIV 72-095-JHP (E.D. Okla. Jan. 30, 2001), was closed for all purposes in 2001, and all injunctions were dissolved. As for plaintiff's other requests for injunctive relief, the court finds the issues are moot, because plaintiff no longer is incarcerated in the detention center. *See Green v. Branson*, 108 F.3d 1296, 1299-1300 (10th Cir. 1997) (citing *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345 (10th Cir. 1994)). *See also Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991); *White v. State*, 82 F.3d 364, 366 (10th Cir. 1996).

Based on the foregoing reasons the court finds the exhausted claims in plaintiff's complaint are vague and conclusory, and the allegations do not rise to the level of a constitutional violation. The Tenth Circuit Court of Appeals consistently has held that bald conclusions, unsupported by allegations of fact, are legally insufficient, and pleadings containing only such conclusory language may be summarily dismissed or stricken without a hearing. *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059 (1990); *Lorraine v. United States*, 444 F.2d 1 (10th Cir. 1971). "Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice." *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) (citing *Brice v. Day*, 604 F.2d 664 (10th Cir. 1979), *cert. denied*, 444 U.S. 1086 (1980)).

The court authorized commencement of this action *in forma pauperis* under the authority of 28 U.S.C. § 1915. Subsection (e) of that statute permits the dismissal of a case when the court is satisfied that the complaint is without merit in that it lacks an arguable basis either in law or fact. *Nietzke v. Williams*, 490 U.S. 319 (1989); *Yellen v. Cooper*, 828 F.2d 1471, 1475 (10th Cir. 1987).

**ACCORDINGLY,** the defendants' second motion for summary judgment (Docket #87) is granted. Plaintiff's unexhausted claims are dismissed without prejudice, and his exhausted claims are dismissed with prejudice as frivolous.

IT IS SO ORDERED this 29th day of September, 2011.

Frank H. Seay
United States District Judge
Eastern District of Oklahoma